247 F.Supp. 648 (1965)
In the Matter of Kingsley O'Dell WRIGHT, Bankrupt.
No. 63 B 2499.
United States District Court E. D. Missouri, E. D.
April 2, 1965.
Order October 19, 1965.
*649 *650 Robert Lee Campbell, St. Louis, Mo., Harry S. Gleick (Associate Counsel) St. Louis, Mo., for Kingsley O'Dell Wright.
Thomas R. Schwarz and P. Terence Crebs, St. Louis, Mo., for Objector American Motors Corp.
WILLIAM O'HERIN, Referee.
On January 29, 1965 an order entered herein denying bankrupt's discharge upon objections filed by American Motors Corporation.
Within ten days, and on February 8, 1965, upon bankrupt's petition, the time for filing a petition for review was extended to March 10, 1965.
On February 8, 1965 bankrupt filed a motion denominated motion for rehearing, praying that the order of January 29, 1965 be set aside and bankrupt be permitted to offer additional evidence. After hearing said motion February 16, 1965, an order entered February 18, 1965 denying same. A timely petition for review as to the orders denying discharge and the motion, was filed March 1, 1965. While an informal opinion in the form of a letter was furnished the attorneys with respect to the order denying discharge, the petition for review now necessitates formal findings, conclusions and opinion.
Bankrupt filed a voluntary petition in bankruptcy November 21, 1963, which constituted an adjudication on that day. The first meeting of creditors was held January 6, 1964. Bankrupt was that day examined and the meeting continued to January 27, 1964, for the filing by bankrupt of a petition to dismiss the proceeding. Such was not done and bankrupt was ordered back for further examination on February 10, 1964. Due to delay in obtaining information from a bank and life insurance companies as to whether or not there was any equity in certain life insurance policies pledged as collateral security at the bank, it was not until April 24, 1964 that these facts were determined and an order entered finding there was no equity and closing the creditors meeting as a no asset case. Creditors did not request appointment of a trustee. In the meantime, the time for filing objections to discharge had been extended to April 30, 1964.
The objections to discharge were timely filed April 30, 1964, and heard on June 29 and July 10, 1964.
There are fifteen specifications of objection. At the outset, it is to be noted that specifications numbered 6 and 7 charge that bankrupt, as president of two corporations, published or caused to be published materially false written statements of his financial condition; specification number 9 charges that within twelve months prior to bankruptcy, bankrupt with intent to hinder, delay and defraud his creditors, removed property from Missouri to Florida. There is no evidence to support these three specifications and same are overruled.
Specification 3 charges a knowing and fraudulent withholding from the court documents reflecting his property and affairs, and specification 4 that bankrupt destroyed, mutilated and falsified books and accounts. The evidence does not sustain these charges and for *651 that reason these specifications are overruled.
Specification 14 is that bankrupt, during the course of his examination under his petition (which refers to examination at creditors meetings), refused to answer material questions by evasion.
It is here noted that at the conclusion of the hearing on the objections (Tr. p. 60 of July 10, 1964), bankrupt's counsel in answer to the court's inquiry stated he had no evidence. He then offered (Tr. pp. 60-61, July 10, 1964) a transcript of the examination of bankrupt had on February 10, 1964, the purpose of which was stated to be that counsel did not wish to put bankrupt back on the witness stand and go back through all this again. This was objected to, apparently, though not so specifically stated, as not the best evidence and would deprive objector the right of cross examination on the issues raised by the objections. This objection was sustained. Bankrupt's counsel then announced that in order to save time he would like to introduce this prior transcript and then permit Mr. Schwarz to cross examine (Tr. p. 62). This procedure was objected to. The transcript does not show any ruling on the objection and bankrupt was then placed upon the stand and his direct examination conducted by his counsel.
While the transcript was not admissible on the theory stated in the offer, it was admissible in defense of the charges of refusal to answer material questions approved by the court and fraudulent concealment, hereinafter referred to, and for such purposes said transcript is considered in evidence and a part of the record in this proceeding.
There is no evidence that bankrupt at any time refused to answer material questions approved by the court and specification 14 is overruled.
Specification 12 charges that within twelve months prior to bankruptcy, with intent to hinder, delay and defraud creditors, bankrupt permitted his property to be removed from Missouri to Florida. There is no evidence to support this specification and it is overruled.
Specifications 8 and 11 are in reality a duplication, charging that within twelve months of bankruptcy bankrupt, with intent to hinder, delay and defraud his creditors, transferred property to his mother, his father, his former wife, Deanne P. Wright, Delmar Auto Sales and K. W. Motors, Inc.
Specifications 10 and 13 are likewise duplications alleging concealment of assets within twelve months of bankruptcy with intent to hinder, delay and defraud creditors.
Specifications 1 and 2 charge fraudulent concealment of assets.
Specification 15 charges failure to explain satisfactorily losses of assets and deficiency of assets to meet his liabilities.
Specification 5 charges concealment of or failure to keep or preserve books of account or records from which his financial condition and business transactions might be ascertained.
Rulings on specifications 1, 2, 5, 8, 10, 11, 13 and 15, hereinabove last summarized, depend upon the evidence.
Bankrupt had been a partner in a business operated under the name of Wright Motors, which was a new automobile dealership, and in addition this business sold used cars under the trade name of Delmar Auto Sales Company.
Subsequent to the failure of the new car dealership business, bankrupt was a partner in a used car business under the trade name of Delmar Auto Sales Company, which subsequently in January, 1959 incorporated under the name Delmar Auto Sales, Inc. The assets of the used car partnership were transferred to this corporation. (Bankrupt's testimony Tr. July 10, p. 79). The incorporators of this company are shown by the articles of incorporation to have been G. Burnett, D. R. Melter and F. H. Wright, the latter being bankrupt's mother (Objector's Ex. 14e). The evidence is that bankrupt was never a stockholder of record *652 in this company but was vice-president in 1962 and at all times a director.
Gene Burnett testified (Tr. June 29, p. 25 et seq.) he was first employed as a salesman by Wright Motors in 1954, which business was run by bankrupt. He worked there until 1957. In 1959 he went to work for Delmar Auto Sales which business was in charge of bankrupt as manager. He did not know who the stockholders were but understood they were bankrupt's mother and father. (Tr. p. 31). He left again in 1960 and returned to the company in 1962. He knew he had appeared on the records of the company as an officer and director. He did nothing as a director; he was a salesman; he never attended a stockholders meeting or made any reports to stockholders.
Objecting creditor offered in evidence, without objection, an unmarked exhibit consisting of interrogatories directed to Delmar Auto Sales, Inc. as garnishee and the answers thereto, filed in a state court suit in which American Motors Company was plaintiff and had obtained a judgment against bankrupt and others. The answers were sworn to January 17, 1964 on behalf of Delmar Auto Sales Inc. by bankrupt's attorney of record in this proceeding. In answer to questions requiring names of those having the responsibility of keeping books and records of Delmar Auto Sales, Inc., since the date of incorporation to July 6, 1963 and the names of those having custody of such books and records at the time of the answering of the interrogatories, the statements are R. Forder Buckley, William Rickert.
William Rickert was offered as a witness by the objecting creditor (Tr. July 10th, p. 33 et seq.). His occupation was that of a tax and business consultant, handling books and records for various small and medium size businesses.
He testified his first business contact with bankrupt was in July, 1962, when bankrupt employed him to bring the records of Delmar Auto Sales, Inc. up to date as same were three or four months behind (Tr. p. 34).
As far as he knew bankrupt was in charge of the business. He brought the ledger up to date and kept it so until November, 1963. He testified he never had permanent charge of the books and records of the company. He would take the records out for posting and then return them to the office.
He identified objectors Ex. 1 as his work sheets used in bringing the records up to date, which had been produced under subpoena to another witness. These showed an item "loans from officers" in the amount of $25,000.00. He asked Wright who the officers were who were owed the $25,000.00 and bankrupt said it was his. (Tr. p. 37). Bankrupt's only explanation of this item was that Rickert was completely wrong. "I said nothing about it", and that the entries with respect thereto were wrong (Tr. p. 92). That he hadn't the faintest idea what it was (Tr. p. 101).
Rickert further testified that the records showed bankrupt's divorced wife was paid $300.00 per month by the company. He asked Wright why this payment was being made and bankrupt said it was alimony (Tr. pp. 37, 38). The divorce decree (Bankrupt's Ex. A) provides for no alimony but does provide for $200.00 per month support money for his four children.
Among Rickert's work sheets (Objector's Ex. 1) appears a memorandum dated August 30, 1962 pertaining to Delmar Auto Sales, Inc. dba Wright Motors, South, showing the last stockholders meeting was January 27, 1959 (apparently the first as date of incorporation was January 7, 1959). That the corporation was authorized to issue 55,000 shares common stock par value $1.00; that the stock book shows only 500 shares issued and outstanding represented by three stock certificates to the following: G. Burnett 100 shares; D. R. Melter 100 shares and F. H. Wright 300 shares. That notwithstanding this the corporate books showed 21,200 shares outstanding, a difference of 20,700 shares. (It is noteworthy that Burnett did not know who the stockholders were. June 29 Tr. *653 p. 31). This memorandum also notes the corporate book record of loans from officers of $25,000.00 hereinabove mentioned and an investment of $7,000.00 in the Playboy Club; in addition, it shows the corporation was paying interest on a $3,000.00 note representing an additional investment in said club.
Rickert further testified that at the end of 1963 Wright owed the company $18,000.00 leaving an excess of $7,000.00 owed Wright after offsetting the $18,000.00 against the $25,000.00 previously mentioned (Tr. pp. 52, 53).
This witness further testified that sometime between July and September, 1963 bankrupt talked to him about organizing another company, the K-W Motor Company. He asked Wright for the incorporation papers and minutes of the new company so he would know how to set up the books but never received them. He could never get straight what was going to take place with respect to transfer of assets of Delmar Auto Sales Inc. to K-W Motors (Tr. pp. 38, 39). That bankrupt was selling automobiles under the name of K-W Motor Company and some under the name of Delmar Auto Sales (Tr. p. 39). He was never able to reconcile charges in connection with the transfer of inventory between Delmar Auto Sales Inc. and K-W Motors (Tr. p. 48). He could never find out what was being transferred from Delmar Auto Sales to K-W Motors or who was putting stock in, (Tr. p. 51). Wright never told him anything about what was going to happen between Delmar Auto Sales and K-W Motor Company and he became disheartened with the job and left (Tr. p. 53). He was never able to come to any conclusion concerning the obligations between the two companies (Tr. p. 58).
Donald E. Litzau, a certified public accountant, offered as a witness by objecting creditor, testified (Tr. June 29th, p. 3 et seq.) he first met bankrupt in February, 1964, the latter stating he would like witness to do some accounting work for K-W Motors, Inc. He received work papers from Rickert in case such would be helpful in establishing records for K-W Motors. These papers which he produced were identified as Objector's Ex. 1, previously mentioned. He also produced sheets from a partially completed ledger pertaining to K-W Motors and identified as Objector's Ex. 2 (Tr. p. 7). These papers were incomplete. He had gone to K-W Motors to train the girl to initiate the bookkeeping records. From the records there available, he could not determine the condition of the company or the source of its assets; the records were not in good shape and witness had trouble being paid, so did not pursue the matter further or do any other work.
Returning to the answer to interrogatories as to the identity of those having custody of Delmar Auto Sales records, R. Forder Buckley, who in addition to Rickert was so designated, was served with a subpoena for this hearing to produce all books and records he might have of Delmar Auto Sales Inc., K-W Motors Inc. and Kingsley O'Dell Wright. In lieu of a personal appearance, objecting creditor accepted Mr. Buckley's affidavit filed June 29th at the hearing, which states that the stock book and minute book of Delmar Auto Sales Inc. were delivered to a representative of bankrupt on December 12, 1963. That the affiant has no knowledge regarding K-W Motors Inc. and has no books or records of said company; that affiant understands some other attorney incorporated that company for Mr. Wright. That affiant has no books or records of Kingsley O'Dell Wright. With the affidavit he submitted the only file he then had on Delmar Auto Sales Inc., which included copies of franchise tax reports, bank authorizations, anti-trust affidavits, copies of articles of incorporation and minutes of the meetings.
R. J. Renz, Vice-president of North-western Bank & Trust Company, offered as a witness by objector, testified (Tr. June 29th, p. 47 et seq. and Tr. July 10th, p. 2 et seq.) with respect to business transactions had with bankrupt.
By the terms of a property settlement contained in the divorce decree of June *654 6, 1957, it was provided that bankrupt convey his interest in the family home at 22 Frontenac, St. Louis County, to his wife and pay off a $10,000.00 first deed of trust according to its terms.
Renz testified that on October 27, 1960, the bank made a $10,000.00 loan secured by a second deed of trust on this real estate. The note was signed by bankrupt and Deanne P. Wright, his former wife. The deed of trust signed by the latter only, she then being the sole owner and single. The evidence does not disclose the recipient of the proceeds of this loan.
The loan was renewed from time to time and on October 3, 1963 the property was refinanced. At this time bankrupt and his former wife executed a note for $40,000.00 payable to the bank, secured by a first deed of trust on the home. From the proceeds of this loan there was paid off a first deed of trust to Mercantile Mortgage of approximately $22,000.00, the balance due on the second deed of trust to the bank and a treasurer's check issued to Deanne Wright for the net balance of $8,477.53. Bankrupt testified this money was used to pay a shortage on the automobile floor plan of Delmar Auto Sales at the Citizens National Bank upon which obligation he, his mother and former wife were personally liable (Tr. July 10, p. 90). The increase in the indebtedness on the real estate from the time of the divorce to the refinancing in October, 1963, must have been for the benefit of bankrupt as he schedules Deanne P. Wright for "periodic loans from 1957 through 1963" in the amount of $53,500.00, which includes the $40,000.00 real estate loan and an insurance loan next mentioned.
Bankrupt had a loan account at the Northwestern Bank secured by assignments of life insurance policies beginning in April, 1958, the original loan being $5,000.00 (Objector's Ex. 9).
From time to time additional loans were made; renewals thereof executed and at the date of bankruptcy the balance due was $13,000.00, evidenced by a note dated November 1, 1963 signed by bankrupt and his former wife. (Objector's Ex. 5). This was a renewal note secured by a collateral pledge of insurance policies, some owned by bankrupt and others by bankrupt's former wife.
In the order entered herein April 24, 1964, it was found that there was no equity in the cash surrender value of the insurance policies as of the date of bankruptcy, November 21, 1963, over the indebtedness due on said note at date of bankruptcy.
On February 4, 1964, another loan was made from the Northwestern Bank in the amount of $3,200.00, evidenced by a promissory note of that date executed by bankrupt and his former wife. As collateral security for this note there was executed a cross-pledge of the insurance policies held by the bank as collateral to the note of November 1, 1964. As additional collateral for the note of February 4, 1964, bankrupt's former wife brought to the bank and pledged as such collateral a stock certificate for 100 shares of common stock of Chippewa Trust Company, St. Louis (Objector's Ex. 7).
This stock certificate was issued December 20, 1962 in the names of Kingsley O. Wright, (bankrupt) and Pamela D. Wright, as joint tenants with right of survivorship and not as tenants in common. On the back, under date of December 23, 1962 appears the blank endorsement of bankrupt and Pamela D. Wright. The latter is bankrupt's daughter. The value of this stock is estimated to be between $3,000.00 and $3,200.00 (Tr. p. 68).
Renz could not explain the entire disbursement of the $3,200.00 loan of February 4, 1964, but bankrupt received $2,334.46 thereof evidenced by a treasurers check in that amount payable to bankrupt (Objector's Ex. 6).
There is no evidence as to when Deanne Wright received the stock certificate. Renz testified that his assumption that she owned it was based on the fact that she presented it to the bank as collateral, claiming ownership (Tr. July 10, pp. 7, 8).
Renz testified (Tr. pp. 11, 12), without objection, that Mrs. Wright told him *655 the loan was made for bankrupt to use in business. Regulation U form, required under the Federal Reserve Act on stock pledges, executed by Mrs. Wright in connection with this loan, bears the notation "Kingsley Wright to use in business." (Objector's Ex. 8). He said he did not inquire what business it was to be used in because he knew what business bankrupt was in and knew he was going to use it in the automobile business but as to which corporation, or partnership or proprietorship it would go into, he did not inquire.
Bankrupt in his testimony admitted he received the $2,300.00 check (Tr. July 10, pp. 82, 83). He said he cashed it and paid bills (Tr. p. 84); that the proceeds went to his wife because payments on the house and child support were behind (Tr. pp. 83, 84).
The ledger sheet covering bankrupt's loans at the bank (Objector's Ex. 9) shows stocks put up as collateral December 13, 1962 to secure an obligation of $10,250.00 due June 1, 1963. Renz testified that such was additional collateral at that point; what stock it may have been he did not know because when stock collateral is released, no record is kept of it (Tr. July 10, 1964 p. 15). It had been released.
Bankrupt testified (Tr. July 10, p. 62 et seq.) that he owned no stock in Delmar Auto Sales at any time or in K-W Motors. That when Delmar Auto Sales was organized as a corproation, the stock was owned by H. B. Wright and F. H. Wright, his parents, and a qualifying share to Buckley. That the owners of the stock in K-W Motors were his parents, C. L. Raney and Robert Holtkamp.
That he was employed by K-W Motors at $1,000.00 per month but was not drawing the salary because business had been bad. That Delmar Auto Sales ceased operation about September 30, 1963, at which time the company was insolvent. That the floor plan loans for this business had been made from the Citizens National Bank and Chippewa Trust Company, which money was borrowed by his entire family; that is his mother, father and himself; that he had also borrowed money from his former wife.
He further testified that in the operation of Delmar Auto Sales and K-W Motors, he was a care taker or general manager for his parents; that his duties were to build up the corporation as a profitable business, which, if he did he stood to gain. In his cross examination with respect to Delmar Auto Sales, he first testified it had never been a partnership (Tr. p. 72). When shown the records he then admitted that prior to it's incorporation, January 7, 1959, the business had been a partnership (Tr. p. 75). When asked who the partners were, he stated they were his mother and Gene Burnett, who went from the Wright Nash into "the set up with us"; that Burnett put up no money but the money for the partnership was put up by his mother. He later testified that the partners were G. R. Murtha, Gene Burnett and F. H. Wright (bankrupt's mother) but the first two named had no financial interest in it (Tr. p. 78). That when the corporation was formed the assets of this partnership were transferred to it as a basis for opening business and, at that time, no other capital was put in (Tr. p. 79).
With respect to the stock certificate of Chippewa Trust Company, bankrupt testified it belonged to his wife when it was pledged at the Northwestern Bank and is presently owned by her.
He also testified that he had lived on borrowed money for many years (Tr. p. 84). That his mother, himself and former wife were on the floor plan obligation at the Citizens National Bank, having guaranteed it personally; and there was also stock collateral as security for this obligation (Tr. pp. 90, 91).
When asked if he was in charge of the books of the companies, he stated that if they are there, they are there (Tr. p. 93); upon further inquiry if he was in charge of the books he testified he guessed anybody is in charge of them "I guess I am in charge of them."
When asked if he had no proprietary interest in the companies, why was he on *656 the floor plan, he stated that this was designed as another chance for him; if it went well "I had a business"; if it didn't, it didn't. That was a chance he took; that his parents had borrowed money for the corporation's benefit and bankrupt's benefit also.
When questioned about the loan from his mother shown in his bankruptcy schedules in the amount of $32,000.00, he said that would be at the Citizens National Bank and dated to about 1960; that he did not receive $32,000.00 from his mother at any one time but from time to time, going back to 1958 (Tr. p. 95); that he could not tell how much money his mother loaned him in 1958 without the records; the loan had built up constantly (Tr. p. 95). That the proceeds of the $32,000.00 loan at Citizens National Bank was used primarily to buy stock in the Delmar Auto Sales by his mother and part of it given to him to live on. He had to sign the loan because the theory was that if he made the corporation pay later on he had to pay it back (Tr. p. 98).
Bankrupt, in his statement of affairs, gave his occupation as an automobile salesman and, in answering the question where presently employed, it is stated that he isn't employed but supervises parent's business interests, Delmar Auto Sales, Inc.
In response to the questions in the statement of affairs as to income from his trade or profession for the two years prior to bankruptcy, the answer is none. In answer to Item 2c of the statement of affairs, which is "have you been in partnership with anyone, or engaged in any business, during the six years immediately preceding the filing of the original petition herein?" the answer is no.
The statement of affairs also shows by his answers that he kept no books or records and that his last Federal and State income tax returns were filed in 1958. The schedules in this case list obligations of $118,782.23, which include the $53,500.00 to his wife and Northwestern Bank previously mentioned; $10,000.00 to his father for periodic loans and $32,000.00 to his mother, designated as a loan. It also includes the judgment of American Motors Corporation in the amount of $9,561.33 and the costs thereon.
Also listed are two unsecured creditors amount unknown representing contingent liability for contribution arising out of payments as a result of joint obligations of bankrupt, said creditors and Wright Motor Company, Inc., which item is disputed with the statement that bankrupt has a setoff for contribution. The only assets scheduled other than the insurance policies pledged at the Northwestern Bank, in which it has been found there was no equity at the date of bankruptcy, are wearing apparel and a watch.
Bankrupt produced no personal records nor any of the corporate records at the hearing on the objections to his discharge.
On the issues presented by specifications 1, 2, 10 and 13 of fraudulent concealment of property, the burden rests upon the objector to show to the satisfaction of the court that there are reasonable grounds for believing that there has been a fraudulent concealment. Fraudulent concealment is never presumed as a matter of law, but inferences may be drawn from the evidence and thus the proof may be circumstantial. However, if the most that can be said are that the circumstances are suspicious, the objections should be overruled.
While an objector need not prove his case beyond a reasonable doubt, as is necessary in the prosecution of a criminal charge of fraudulent concealment, the case must be proved by a preponderance of the evidence so as to make a prima facie case.
While the record here raises questions of doubt and suspicion on the part of this court, the charges of fraudulent concealment cannot be sustained without resort to surmise, speculation and conjecture. Such may not be done and it is for the foregoing reasons that specifications 1, 2, 10 and 13 are overruled.
*657 At the trial, the court expressed concern and dissatisfaction when the facts developed that bankrupt, subsequent to the filing of the bankruptcy petition, and on February 4th, 1964, made another loan at the Northwestern Bank and Trust Co. and cross pledged as collateral security the same insurance policies which had previously been pledged as collateral security for another note covering a loan from said bank three weeks prior to bankruptcy, which latter transaction was reflected in the schedules. The loan and collateral pledge of February 4, 1964 was prior to the entry of the order finding there was no equity in the insurance policies owned by bankrupt, pledged as collateral for the loan of November 1, 1963.
While in this court's opinion it was highly improper for bankrupt to make an additional pledge of security owned by bankrupt pending court order covering the matter, the fact is that on the second loan additional collateral was furnished, being the stock in the Chippewa Trust Company, put up by bankrupt's former wife. While this stock was originally issued in the names of bankrupt and his daughter, it was endorsed in blank by them three days after issue, was in the possession of his former wife, claiming ownership and pledged as her property at the time of the loan February 4, 1964, and there is no evidence that bankrupt had any interest therein at the date of bankruptcy. It was found by this court that there was no equity in the insurance policies owned by bankrupt and the foregoing transaction does not sustain the charge that bankrupt transferred property in fraud of creditors as charged in specifications 8 and 11. There is no other evidence on this issue which would justify the court in sustaining said specifications and same are overruled.
The remaining specifications are number 5, charging that bankrupt has failed to keep or preserve books of account of records, from which his financial condition and business transactions might be ascertained and specification 15, that bankrupt has failed to explain satisfactorily losses of assets and deficiency of his assets to meet his liabilities.
This bankrupt is not an ordinary artisan, mechanic or small farmer, whose ordinary pursuits give rise to few and unimportant transactions. Nor can it be said that he is an ordinary employee of an automobile company. To the contrary, he is a businessman of many years experience, whose financial transactions have been many, varied, complex and substantial.
Since the Amendment of the Bankruptcy Act in 1926, failure to keep adequate books or records must no longer be with an intent to conceal; the bankrupt must now really have the necessary records or explain why the circumstances of his case excuse his failure. In re Marx, 125 F.2d 335 (C.A.7th); Nix v. Sternberg, 38 F.2d 611 (C.C.A.8th), cert. den. 282 U.S. 838, 51 S.Ct. 20, 75 L.Ed. 744.
Complete disclosure is in every case a condition precedent to the granting of a discharge, and if such a disclosure is not possible without the keeping of books and records, then the absence of such amount to that failure to which the Act applies; it is intended that there be available written evidence made and preserved from which the present financial condition of the bankrupt and his business transactions for a reasonable period in the past, may be ascertained. Records of substantial completeness and accuracy are required so that they may be checked against the mere oral statements or explanations made by bankrupt. In re Underhill, 82 F.2d 258, 259, 260 (C.C.A.2d). See also In re Yaeger, D.C., 28 F.Supp. 117.
Creditors are entitled to the assistance of books of account  proper under the circumstances  to ascertain the nature and extent of the business transactions of the bankrupt and to determine whether or not it is an honest bankruptcy. In re Nichols, 53 F.Supp. 4, 9 (D.C.E.D.Mo.).
*658 The question of whether or not a bankrupt has kept and preserved adequate books and records to disclose his financial condition and business transactions is one in the reasonably wide discretion of the trial court. In re Nix v. Sternberg, 38 F.2d 611 (C.A.8th); In re Marx, 125 F.2d 335; In re Romano, D.C., 196 F.Supp. 954.
The burden is upon the bankrupt to adduce sufficient proof to enable his financial condition to be ascertained. In re Baker, D.C., 139 F.Supp. 646; In re Romano, 196 F.Supp. 954.
In the case of In re Muss, 100 F.2d 395 (C.C.A.2d), the bankrupt had engaged in extensive financial transactions. He kept no personal books or records, testifying he transacted most of his business through two corporations and that the corporate books sufficiently disclosed his financial condition and business transactions. The court below was not convinced that they did nor was the appellate court. The Court of Appeals, affirming a denial of discharge by the District Court, held that a bankrupt engaging in extensive transactions as there shown and kept no record thereof should be denied a discharge and the order could not properly have been otherwise.
In Karr v. Marshall, 262 F.2d 358 (C.A.2d) the only records bankrupt claimed to have kept were memoranda of items of income or expenditures which at the end of the year he turned over to an accountant who recorded the figures on a worksheet, prepared his income tax returns and then discarded the originals. The evidence showed substantial business activities on the part of bankrupt. He was an officer and purchasing or selling agent of other businesses and active in behalf of a manufacturing company operated by his brother-in-law.
The appellate court affirmed an order of the District Court denying discharge for failure to keep or preserve books of account on records from which his financial condition and business transactions might be ascertained.
It has also been held that in an individual bankruptcy, refusal of discharge was proper where books of corporation controlled by bankrupt were not produced. Simon v. Massachusetts Trust Co., 276 F. 391 (C.C.A.1st).
In the case of In re Sandow, 151 F.2d 807 (C.C.A.2d) bankrupt kept no books or records of his own. Most of his obligations grew out of three business ventures in which bankrupt and two others participated as part owners, which business was conducted by three corporations formed by bankrupt and his associates. None of the corporate books or records were produced. Discharge was denied.
From the record here, neither this court nor any creditor can ascertain bankrupt's financial condition or his business transactions either with respect to the corporate enterprises or his own personal affairs.
His failure to keep personal books of account or records from which his financial condition and business transactions might be ascertained is not justified under all the circumstances of his case. Specification number 5 is therefore sustained.
By reason of the utter failure to comply with the statutory requirements with respect to books and records, the objecting creditor was unable to, in the first place, clearly establish the existence of assets and, as a result of inability to establish such a base, sustain the charge of failure to explain losses. This statement is likewise applicable to a number of other specifications which the court is obliged to overrule on the present record.
It was for the foregoing reasons that the order of January 29, 1965, denying bankrupt's discharge, was entered.

THE MOTION FOR REHEARING
On February 8, 1965 bankrupt filed a pleading captioned "Motion of Bankrupt for Rehearing on Objections to Discharge" which was denied by order entered February 18, 1965.
An appeal does not lie from an order denying a rehearing in a bankruptcy proceeding. Pfister v. Northern Illinois Finance Corporation, 317 U.S. *659 144, 63 S.Ct. 133, 137, 87 L.Ed. 146; In re American Textile Printers Co., D.C., 152 F.Supp. 901; Old Colony Trust Co. v. Kurn, 138 F.2d 394 (C.C.A.8th).
However, the allegations of the motion and prayer for relief that the order denying discharge be set aside and bankrupt be permitted to offer additional evidence, seem to be based on Rule 60(b) of the Federal Rules of Civil Procedure providing that on motion the court may relieve a party from a final judgment or order by reason of (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b).
The allegations by reason of which relief is sought may be summarized as follows: (1) that bankrupt's attorney failed to realize it was necessary to offer in evidence books and records of the two corporations which if received on rehearing will show details of the operations of the companies; (2) that evidence will be produced showing the increase in obligations of bankrupt to his former wife and his parents since 1958; and (3) records of Citizens National Bank of Maplewood and Chippewa Trust Company showing details of automobile floor planning of the two corporations engaged in the automobile business.
Collier on Bankruptcy (14th Ed.) par. 2.12 page 188 et seq., reviewing many cases on the subject, states that it is believed that in connection with the modification or vacation of orders or decrees, Federal Civil Rule 60(b) is inapplicable in bankruptcy proceedings, as inconsistent therewith. See also the article by Oglebay (co-author of Collier on Bankruptcy) entitled Some Developments in Bankruptcy Law Vol. 20 Journal of National Association of Referees in Bankruptcy, p. 76, subheading Effect of Federal Rule 60b pp. 80 et seq., which article is cited in an able discussion of the question in Grand Union Equipment Co. v. Lippner, 167 F.2d 958, 961 (C.C.A.2d).
Whether section 60(b) be here applicable or not, the motion was ruled on its merits.
At the outset it is noteworthy that the motion does not assert that bankrupt kept any personal books or records. In fact it is undisputed that he did not, and it was found that his failure so to do was not justified under the circumstances of this case and was the basis for denial of his discharge.
As to bankrupt's attorney's lack of knowledge of procedure on objections to discharge, he stated at the hearing on the motion, that he had not been paid adequate compensation for services rendered bankrupt in the bankruptcy case and simply could not afford to devote time to looking up law respecting a trial of objections to discharge. Ignorance of rules of procedure is not "excusable neglect" within the meaning of the term as used in Section 60(b). Ohliger v. United States, 308 F.2d 667 (C.A.2nd). A showing of carelessness or negligence is neither inadvertence nor excusable neglect justifying granting a motion under Section 60(b). Federal Enterprises v. Frank Allbritten Motors, 16 F.R.D. 109 (D.C.Mo.).
Where the denial of discharge was on the merits and after hearing, it will not be set aside without an adequate showing of newly discovered evidence or some other reason to believe that there was an error and that the result upon a rehearing would be different. Remington Vol. 7 sec. 3224 p. 376. Such a motion is properly denied in the absence of a showing that the additional evidence would affect the finding of unjustifiable failure to keep books of account or records. In re Massa, 133 F.2d 191 (C.C.A. 2d).
Here there is no showing of any newly discovered evidence. All of the evidence referred to in the motion was in existence and known to bankrupt and his counsel at the time of the trial.
The findings of fact made on the objections, show the increase of bankrupt's obligations to his former wife and parents. *660 The accountants testified that both the corporations were insolvent. And in view of their testimony as to the condition of the books and records of the two corporations, how such could clearly show the operations of the corporations, much less the financial condition and business transactions of this bankrupt, is inexplicable to this court.
It was for the foregoing reasons that the motion was denied and such motion is addressed to the sound legal discretion of this court. Siberell v. United States, 268 F.2d 61 (C.A.9th); Securities & Exch. Com'n. v. Farm & Home Agency Inc., 270 F.2d 891 (C.A.7th).
No findings of fact or conclusions of law on the issues raised by the specifications of objection to discharge are made or given other than in this memorandum contained.
HARPER, Chief Judge.

ORDER
The memorandum of the Referee is hereby adopted as the memorandum of the court and the order of the Referee is in all respects confirmed.